BOEHRINGER MANNHEIM
DIAGNOSTICS, INC. f/k/a
Hycel, Inc., Plaintiff,

v.

PAN AMERICAN WORLD AIRWAYS,
INC., Defendant.

Civ. A. No. H–80–1421.

United States District Court,
S. D. Texas,
Houston Division.

Nov. 24, 1981.

Alden D. Holford, Burgess & Holford, Houston, Tex., for plaintiff.

T. M. Wall, Hutcheson & Grundy, Houston, Tex., for defendant.

## MEMORANDUM OPINION

ELY, Senior Circuit Judge, Sitting by Designation.

Plaintiff Hycel, Inc. ("Hycel")[1] seeks recovery against defendant Pan American World Airways, Inc. ("Pan Am") under the Warsaw Convention[2] for damage to its Super 17 Blood Chemistry Analyzer (the "Analyzer") that allegedly occurred during de-

fendant's shipment of the Analyzer from Brazil to Houston, Texas. Defendant denies liability and also contends that in any event the Convention limits its liability to $9.07 per pound.[3] For the reasons set forth in the following opinion the Court rejects defendant's contentions and holds defendant liable for the full amount of the repair cost of the Analyzer, reasonable attorney's fees, and prejudgment interest from the date plaintiff received the damaged Analyzer.

### I. *The Shipment*

In the spring of 1978 Hycel exhibited one of its large automated blood analyzers, a "Super 17," at the 1978 Department of Commerce Trade Show held at the United States Trade Center in Sao Paulo, Brazil. Hycel used the Analyzer to run simulated tests that demonstrated how the machine automatically determined the chemical makeup of a patient's blood.

After the four-day trade show Metropolitan Transports, Inc., a Brazilian firm, repacked the Analyzer for its transport to Viracopos Airport in Brazil and its return to the United States. Testimony by the firm's vice-president indicated there was no damage to the instrument at the time it was repacked and no reports of damage during its transport to Viracopos Airport. Pan Am contracted for carriage of the Analyzer by issuing its Air Waybill No. 026–21569564 on June 27, 1978, while the Analyzer was still at the United States Trade Center, and received the instrument at its Viracopos Airport facility on July 14, 1978. Pan Am made no objections to the condition of the crated Analyzer upon its arrival at the airport.

Because Pan Am had no direct flights from Brazil to Houston, Texas, it loaded the

---

1. Boehringer Mannheim Diagnostics, Inc. is successor in interest to plaintiff Hycel, Inc. For simplicity, and because plaintiff originally was designated as such, this opinion will refer to plaintiff as "Hycel, Inc." or "Hycel."

2. Convention for the Unification of Certain Rules Relating to International Transportation by Air, *opened for signature* October 12, 1929,

49 Stat. 3000, T.S. No. 876 (English version at 49 U.S.C. § 1502 note (1976)) (hereinafter referred to as the "Warsaw Convention" or "Convention").

3. *See* Warsaw Convention art. 22(2), (4) (set out in text accompanying note 10 *infra*); Pan Am's First Amended Answer at 5.

crated Analyzer onto a freight plane bound for New York City, then transferred the crate in New York to a passenger plane, a Boeing 747, in which the Analyzer traveled to Intercontinental Airport at Houston, Texas. The transfer in New York required laying the 1860-pound crate on its side so that it would clear the shorter 64-inch-high doors of the passenger plane. Testimony at trial indicated Pan Am employees tilted the crate by using a somewhat risky procedure in which two or three forklifts push and then catch the crate as it falls. There was no direct testimony to show whether the crate actually was damaged during this process.

On August 22, 1978, a delivery truck arrived to pick up the Analyzer at Pan Am's Houston airport facility for transport to Hycel's plant. The driver and a Pan Am employee discovered then that the crated Analyzer had been damaged. The crate apparently had sustained a severe impact that dented and separated the plywood near the top edge and punched a hole in the top surface. After making a notation of the hole and the damage on the delivery ticket, the driver transported the Analyzer to Hycel. Hycel's traffic manager accepted and signed for the Analyzer, also noting on the ticket the damage and the need for a full inspection. Later the same day Hycel's export coordinator notified Pan Am by letter of the company's intent to file a claim against the airline for the damage to the Analyzer.

## II. Liability

### A. The Warsaw Convention

■ Both parties agree that the Warsaw Convention, which governs the liability of air carriers in international transportation, applies to this case.[4] Plaintiff seeks to hold defendant liable under Article 18(1) of the Convention, which subjects carriers to liability "for damage sustained in the event of ... damage to ... any goods, if the occurrence which caused the damage so sustained took place during the transportation by air." The Convention defines "transportation by air" to "comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft." Warsaw Convention art. 18(2). Thus, plaintiff need show only that the Analyzer was in good condition when transportation by air began, i.e., when defendant took charge of the instrument, and that it was damaged when transportation by air was completed. See, e.g., Dalton v. Delta Airlines, Inc., 570 F.2d 1244, 1245 (5th Cir. 1978).

Defendant contends that plaintiff has failed to show that the Analyzer was in good condition upon its arrival at defendant's Viracopos Airport facility on July 14, 1978. Under the Convention, however, plaintiff receives the benefit of a presumption that, subject to proof to the contrary, damage has been the result of an event that took place during the transportation by air if the prior transportation by land "takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery, or transshipment." Warsaw Convention art. 18(3).

■ Undisputed evidence shows that defendant's Air Waybill for the transport of the Analyzer was issued on June 27, 1978. Since the Waybill is prima facie evidence of the conclusion of the contract, see Warsaw Convention art. 11(1), land transportation of the Analyzer after June 27 must be deemed transportation for the purpose of loading or delivery in the performance of a contract for transportation by air within the meaning of Article 18(3). The Court must presume, therefore, that the damage occurred during the transportation by air, unless defendant proves to the contrary. Defendant has come forward with no such evidence.

4. See Joint Pretrial Order at 7. The United States and Brazil were parties to the Warsaw Convention at the time of the shipment at issue in this case. The United States formally adopted the Convention on July 31, 1934, and the President proclaimed the Treaty ninety days later. See Lowenfeld & Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497, 502 (1967). Brazil was an original signatory to the Convention. See 49 Stat. 3014 (1934).

■ Further, and apart from the presumption of Article 18(3), plaintiff has produced sufficient evidence to establish that the Analyzer was not damaged when it arrived at Viracopos Airport. Testimony by the vice-president of the Brazilian company that repacked the Analyzer at the United States Trade Center indicated the instrument was not damaged then nor during its delivery to Viracopos Airport. It is undisputed that defendant took no exception to the Analyzer's condition upon its arrival at Viracopos on July 14, 1978.[5] Plaintiff has met its burden of proof on this issue.

The Court also rejects defendant's contention that it took "all necessary measures to avoid the damage or that it was impossible for [it] to take such measures" and is thus relieved of liability under Article 20(1) of the Convention. Defendant asserts that because the crated Analyzer was "topheavy" and had no markings to warn of its weight or delicate nature defendant's employees had no way of knowing the risk involved in attempting to lay the Analyzer on its side.

■ The Court is not persuaded that these facts exonerate defendant from liability for the extensive damage caused the Analyzer in this case. The crate's obviously enormous weight and height should have alerted defendant's employees to the risks inherent in tilting the crate, and the employees in any event could have prevented the sharp blow through more careful handling.[6] Similarly, the Court rejects defendant's contention that plaintiff contributed

to the damage by its negligence in not marking warnings on the crate.

### B. Texas Common Law

■ On the basis of the facts established in this case the Court is of the opinion that defendant is additionally liable to plaintiff under the Texas common law of negligence by operation of the doctrine of res ipsa loquitur. Plaintiff has established (1) that the care and handling of the Analyzer, from its arrival at Viracopos Airport in Brazil to its delivery at Intercontinental Airport—Houston, was under the management and control of defendant, and (2) that the damage to the Analyzer would not ordinarily have occurred in the absence of negligence.

The Court, therefore, applies the doctrine of res ipsa loquitur as limited by Texas courts[7] and holds the evidence sufficient to infer negligence on the part of defendant. See Mobil Chemical Company v. Bell, 517 S.W.2d 245, 250–57 (Tex.1974); Honea v. Coca-Cola Bottling Co., 143 Tex. 272, 183 S.W.2d 968, 969 (1944). Defendant's liability under Texas law for attorney's fees is discussed in part III(C) infra.

### III. Damages

#### A. Cost of Repair

The parties have agreed that the correct measure of damages is the reasonable cost to plaintiff of repairing the damaged Analyzer.[8] Plaintiff has amply documented its expenditure of $34,054.04 in parts, labor, and overhead for the repair of the Analyz-

---

**5.** Contrary to defendant's contention, Article 11(2) does not prevent the Court from considering this evidence. Article 11(2) relates to whether "statements in the air waybill" can constitute evidence against the carrier. The undisputed fact that defendant made no objections to the condition of the Analyzer when it arrived at Viracopos does not refer solely to the lack of notations on the Air Waybill, but rather is evidence of the lack of any and all objections in whatever form. See Joint Pretrial Order at 4 (Admission of Fact Nos. 7, 8).

Moreover, the carrier's acceptance of the goods "in apparent good order," and the lack of any written exceptions on the Air Waybill, does constitute evidence against defendant as to the

Analyzer's apparent condition. See Warsaw Convention art. 11(2); Plaintiff's Exhibit 1. The extensive damage to the outside of the crated Analyzer certainly would have been apparent upon its arrival at Viracopos Airport if such damage had existed at that time.

**6.** Plaintiff proved at trial that the crate's center of gravity was less than two inches above the center line of the machine.

**7.** See Lairsey v. Advance Abrasives Co., 528 F.2d 991 (5th Cir. 1976); 1A Moore's Federal Practice ¶ 0.315[2], at 3206 (1978).

**8.** See Joint Pretrial Order at 7.

er, taking into account $5,447.60 erroneously included in plaintiff's work order and $4,000.00 erroneously omitted.[9] Defendant objected at trial that plaintiff's figures do not reflect the cost of repair in 1978, the date of damage, since the actual repair occurred in spring of 1980. Plaintiff's witnesses, however, testified that repair costs in 1978 would have been the same, and defendant offered no evidence to the contrary.

## B. *The Warsaw Convention Limitation of Liability*

██ We come now to the core of the parties' dispute over damages: whether the limitation of the carrier's liability for damage to goods as set out in Article 22 of the Warsaw Convention—250 French gold francs per kilogram—is to be converted to U.S. dollars with reference to the former "official" price of gold or with reference to the current free-market price of gold. Plaintiff and defendant have thoroughly and ably briefed the issue, and they have accurately noted the lack of American precedent on this issue. After reviewing the Convention's language and history, and after considering the arguments of policy advanced by counsel for both sides, the Court concludes that defendant's limitation of liability under the Convention is properly determined by reference to the current free-market price of gold. Defendant's attempt, therefore, to limit its liability to $9.07 per pound by tariff—by reference to the former "official" price of gold—is null and void under Article 23 of the Convention as a provision tending to fix a lower limit than that which is laid down in the Convention. *See Saiyed v. Transmediterranean Airways,* 509 F.Supp. 1167 (W.D.Mich.1981).

The pertinent portions of Article 22 provide:

(2) In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of 250 francs per kilogram . . . .

. . . .

(4) The sums mentioned above shall be deemed to refer to the French franc consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths. These sums may be converted into any national currency in round figures.[10]

A brief review of the history of the Convention's liability limitations and of recent developments in the international monetary system reveals the current ambiguity in the method for converting "250 francs per kilogram" to U.S. dollars.

### 1. *The Gold Standard*

The United States has adhered to the original language of the Warsaw Convention, drafted at conferences in Paris and Warsaw in 1925 and 1929, since 1934, when the President proclaimed the Treaty.[11] The drafters designed the Treaty to achieve two goals: first, to set out uniform rules relating to air transportation documentation, and, second, to foster the development of the infant aviation industry by limiting their liability. In exchange, the Treaty established a presumption of the carrier's liability for personal injuries or damaged goods. *See Block v. Compagnie Nationale Air France,* 386 F.2d 323, 327 (5th Cir. 1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968). The liability limitations of Article 22 were expressed in terms of the Poincaré gold franc, a French

---

**9.** *See* Plaintiff's Exhibit 26. The parties stipulated in open court to the upward adjustment of $4,000 which reflects chemical testing of the repaired Analyzer.

**10.** The official language of the Convention is French. *See* 49 Stat. 3000–13 (1934); *Reed v. Wiser,* 555 F.2d 1079, 1082 n.5 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977). The United States Senate used the English version, however, in giving its advice and consent in 1934. *See* 49 Stat. 3014 (1934);

*Reed v. Wiser,* 555 F.2d at 1082 n.6; Lowenfeld & Mendelsohn, *supra* note 4, at 502.

**11.** For a thorough account of United States participation in the Convention and its subsequent amendments, *see* Lowenfeld & Mendelsohn, *supra* note 4. *See also Block v. Compagnie Nationale Air France,* 386 F.2d 323, 326–30 (5th Cir. 1967), *cert. denied,* 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

coin in use during 1929 that contained a fixed amount of gold,[12] and could be converted "into any national currency in round figures." Warsaw Convention art. 22(4). The drafters used gold as the unit of reference, instead of pegging the limits to some particular national currency like the dollar or pound, to avoid fluctuations in currency values and problems that might be caused by unilateral action by the government whose currency was used in the liability clause—in short, the drafters looked to gold's stability and its tendency to reflect real values better than currency.[13]

In 1929, an ounce of gold was worth approximately twenty U.S. dollars.[14] When the United States devalued the dollar in 1934, however, it established an official gold price of $35 an ounce.[15] The conversion of the liability limitations in the Convention to U.S. dollars remained firmly tied to this rate for nearly 40 years, chiefly because of the inception of the International Monetary Fund (IMF) in 1944.[16] The IMF instituted a system of international currency ex-

change based on assigned par values for each nation's currency—par values that were tied to the dollar value of gold at $35 an ounce.[17] Because U.S. citizens were prohibited from buying and selling gold,[18] and because IMF nations used the $35 rate in their gold transactions with each other and on the open market, the price of gold on any market varied little from this established value.[19] From 1933 until the early 1970s, therefore, "250 francs per kilogram" was equal to approximately $7.52 per pound at the official rate and at the prevailing market rate.[20]

United States dissatisfaction with the extremely low passenger liability limitation ($8,300 per person) led to proposed revisions of the Convention in the 1950s and 1960s.[21] Although the Hague Protocol of 1955 [22] doubled the carriers' liability for personal injury, the United States refused to become a party to the amendment, insisting that the limitation still was too low.[23] In 1966, after 10 years of negotiations and with the prospect of the United States' denunciation

---

**12.** *See* Asser, *Golden Limitations of Liability in International Transport Conventions and the Currency Crisis*, 5 J.Mar.L. & Com. 645, 645 (1974). The Poincaré franc has been used in gold clause limitations of liability in all multilateral transportation conventions since 1924. *See id.* at 645–46.

**13.** *See* Heller, *The Warsaw Convention and the "Two-Tier" Gold Market*, 7 J. World Trade L. 126, 129 (1973); Heller, *The Value of the Gold Franc—A Different Point of View*, 6 J.Mar.L. & Com. 73, 91–92 (1974); Martin, *The Price of Gold and the Warsaw Convention*, 4 Air L. 70, 71 (1979). *Cf.* Asser, *supra* note 12, at 664 (purpose of gold clause is to establish certainty that the real value of the limitation amount shall be equal regardless of the currency of payment or the time of conversion). *See also* Bureau of Consumer Protection, Civil Aeronautics Board, Memorandum on Warsaw Convention Liability Limits at 6 (March 18, 1980).

**14.** *See* Lowenfeld & Mendelsohn, *supra* note 4, at 499 n.10.

**15.** Gold Reserve Act of 1934, ch. 6, § 12, 48 Stat. 342 (1934); Presidential Proclamation No. 2072, 48 Stat. 1730 (1934). *See* Asser, *supra* note 12, at 650 & n.13.

**16.** Congress approved the United States' participation in the IMF in 1945. *See* Bretton Woods Agreements Act, ch. 339, § 2, 59 Stat.

512 (1945) (codified at 22 U.S.C. § 286 (1976)). For a thorough account of the development of the IMF and the recent international currency crisis, see Heller, *The Value of the Gold Franc—A Different Point of View*, 6 J.Mar.L. & Com. 73, 79–91 (1974).

**17.** *See* Heller, *supra* note 16, at 79–80.

**18.** *See* Gold Reserve Act of 1934, ch. 6, §§ 3, 6, 48 Stat. 340 (1934) (repealed by Par Value Modification Act of 1973, Pub.L.No. 93–110, 87 Stat. 352 (1973)).

**19.** *See* Asser, *supra* note 12, at 650; Heller, *supra* note 16, at 81, 95; Heller, *The Warsaw Convention and the "Two-Tier" Gold Market*, 7 J. World Trade L. 126, 128 (1973).

**20.** *See* 37 Fed.Reg. 11,385 (1972).

**21.** *See* Lowenfeld & Mendelsohn, *supra* note 4, at 501–16, 532–96.

**22.** Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, *opened for signature* at The Hague, September 28, 1955.

**23.** *See* Lowenfeld & Mendelsohn, *supra* note 4, at 504–16.

of the entire Warsaw Convention, air carriers agreed in Montreal to raise their liability limitations for personal injuries to $75,000 per person.[24] The limitation for goods, however, remained unchanged at 250 gold francs per kilogram.

Events in the late 1960s and 1970s saw an end to the stability of the U. S. dollar value of gold. In 1968 the IMF countries stopped buying and selling gold on the free market at the official $35-an-ounce rate, fostering a new free market for newly minted and privately held gold.[25] IMF countries retained the official gold rate solely for transactions among their central banks and permitted the free-market price to differ from their currencies' par value.[26] This "two-tier" gold market generated a free-market price for gold that quickly exceeded $35 an ounce.[27]

In August 1971 the President announced that the United States no longer would convert the dollar into gold reserves.[28] This decision not only meant that an "official" U. S. dollar value for gold became purely hypothetical, but also cast doubt on the use of gold as a significant element in the IMF system of international currency transactions.[29] The United States devalued the dollar in 1971[30] and again in 1973,[31] increasing the "official" price of gold to $38 and then to $42.22 an ounce. In 1976 the United States ended the 43-year link between the dollar and gold by ratifying amendments to the IMF agreement that would abolish the concept of an official price of gold.[32] The "official" price of $42.22 an ounce was finally abolished on April 1, 1978, the date upon which the IMF amendments became effective.[33]

### 2. The CAB and Airline Tariffs

Until 1971 the Civil Aeronautics Board (CAB) had set air carrier liability for damaged goods under the Convention at $7.52 per pound, using the gold-dollar conversion rate of $35 an ounce.[34] Because the CAB calculated the airlines' limitations based on the "official" gold price, it saw no need to require revision of the airlines' tariffs to reflect the new free-market gold price that developed under the two-tier market system after 1968. After the 1971 devaluation of the dollar, the CAB directed airlines to file tariffs that reflected the new "official" U. S. gold price.[35] Again in 1973 the CAB ordered revised tariffs to reflect the second devaluation.[36] The carriers complied and

**24.** See id. at 532–99; Heller, supra note 16, at 77. The Civil Aeronautics Board approved the agreement on May 13, 1966. See 31 Fed.Reg. 7302 (1966) (CAB Order E–23680, Dkt. 17325).

**25.** See Asser, supra note 12, at 650; Heller, supra note 16, at 82.

**26.** See H.R.Rep.No. 203, 93d Cong., 1st Sess. 12, reprinted in [1973] U.S.Code Cong. & Ad. News 2050, 2061; Heller, supra note 16, at 82.

**27.** See Asser, supra note 12, at 651; Heller, supra note 16, at 82; Heller, supra note 19, at 128–29.

**28.** See S.Rep.No. 678, 92d Cong., 2d Sess. 4, reprinted in [1972] U.S.Code Cong. & Ad.News 2209, 2212. See also Asser, supra note 12, at 651; Heller, supra note 19, at 127; Martin, supra note 13, at 71.

**29.** Heller, supra note 16, at 83. Cf. Asser, supra note 12, at 664–65 (event may have eliminated factual link of gold to currencies but did not affect formal link established by currencies' par values).

**30.** The United States agreed to the devaluation in December 1971 and passed implementing legislation in 1972. Par Value Modification Act of 1972, Pub.L.No. 92–268, § 2, 86 Stat. 116 (1972). See Heller, supra note 19, at 127.

**31.** Par Value Modification Act of 1973, Pub. L.No. 93–110, § 1, 87 Stat. 352 (1973).

**32.** Act of Oct. 19, 1976, Pub.L.No. 94–564, 90 Stat. 2660 (1976). See S.Rep.No. 1148, 94th Cong., 2d Sess. 10–15, reprinted in [1976] U.S. Code Cong. & Ad.News 5935, 5944–49.

**33.** See 22 U.S.C. § 286a note (Supp. II 1978); Martin, supra note 13, at 71.

**34.** See 37 Fed.Reg. 11,385 (1972).

**35.** Order 72–6–7, Dkt. 24521, adopted June 2, 1972, 37 Fed.Reg. 11,384–85 (1972).

**36.** Order 74–1–16, Dkt. 26274, adopted Jan. 3, 1974, 39 Fed.Reg. 1526 (1974). See 14 C.F.R. § 221.38(j) (1981) (requiring the limitations to be set out in carrier tariffs).

filed tariffs that set their liability limit after 1973 at $20 per kilogram of damaged goods, or $9.07 per pound.[37]

When the United States abandoned its official price for gold in 1978, however, the CAB took no action to require revised tariffs. In an exchange of memoranda between March 1980 and May 1981, the Board's Bureau of Compliance and Consumer Protection suggested that the abolition of an official gold price "appear[s] to have removed the legal basis for using" the limitation of $9.07 per pound.[38] The Bureau later withdrew this suggestion, stating that although "it is not entirely clear how the limits should be converted,"[39] the Board should continue to engage in the "legal fiction" that an official gold price exists in order "to fulfill its obligation to observe, to the extent possible, the requirements of . . . the Warsaw Convention."[40]

■■■ Thus, to the present day, during a time in which the free-market price of gold has risen to more than $400 an ounce,[41] the CAB has allowed airlines to calculate their limitation of liability under the Warsaw Convention based on the artificial, nonexistent figure of $42.22 an ounce.

### 3. The Free-Market Price of Gold

Allowing defendant to limit its liability under the Convention based on the now-abolished "official" gold price of $42.22 an ounce would perpetrate a legal fiction of the purest kind. The Court finds no justification in the language or history of the Warsaw Convention to justify such a holding in this case.[42]

Apparently no reported American decision has addressed the issue since the official gold price was abolished in 1978. Counsel cite no cases on point and the Court is also unable to find precedent.[43] One recent Second Circuit decision, however, assumed in dicta that the free-market price of gold now applies to conversion of the Convention's liability limitations. See Reed v. Wiser, 555 F.2d 1079, 1089 & n.12 (2d Cir.), cert. denied, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).[44] The handful of foreign tribunals that have addressed the issue have not been uniform in result.[45]

Without the benefit of precedent, therefore, the Court must base its decision on a close reading and interpretation of Article 22 of the Convention. The Court must look to

---

**37.** See Defendant's Exhibit 16.

**38.** See Bureau of Consumer Protection, Civil Aeronautics Board, supra note 13, at 4.

**39.** Bureau of Compliance and Consumer Protection, Civil Aeronautics Board, Memorandum on Warsaw Convention Liability Limits at 5 (May 20, 1981).

**40.** Id. at 6. In his commentary on the dilemma Asser concluded that "[t]here appears to be no logical solution." Asser, supra note 12, at 666.

**41.** See Plaintiff's Exhibit 39 (Wall Street Journal quotations of gold prices for June 27, 1978).

**42.** One must distinguish this case from the issue whether an existing official gold price must be used in converting the Convention limitations. See discussion in note 46 infra.

**43.** Moreover, there appears to be no reported American cases involving a challenge to the use of the official price of gold before it was abolished in 1978.

**44.** Another recent case involved a plaintiff who refused to accept a settlement of $20 from the

defendant carrier for loss of three valuable pieces of jewelry weighing less than one kilogram. Plaintiff, however, argued not that the limit was more than $20 per kilogram, but that the limitations did not apply in his case. See Greely v. KLM Royal Dutch Airlines, 85 F.R.D. 697 (D.C.N.Y.1980).

**45.** See Hornlinie v. Société Nationale des Petroles Aquitaine, Decision of April 14, 1972 (N.J.1972, 269) (Dutch High Council holding that the official price of gold should be used in applying the analogous limitation provisions of the Shipowners' Liability Convention). The Hornlinie case is extensively reviewed in Asser, supra note 12, at 652–61. See also Heller, supra note 16, at 101–02.

Heller describes a recent Swedish decision in which the judge calculated the defendant's liability, apparently under the Shipowners' Liability Convention, based on the price of gold on the free market at the time of the collision. Heller, supra note 16, at 99–100 (quoting In re Saga, decision of October 2, 1973). See also Asser, supra note 12, at 662.

the ordinary meaning of the words in the context in which the words are used, the title and statement of purpose, the negotiation of the agreement, drafts and records of deliberations, negotiating history, a party's unilateral statement of understanding, the subsequent practice of parties, change of circumstances relating to performance, compatibility with international law and general law.

*Block v. Compagnie Nationale Air France*, 386 F.2d 323, 337 (5th Cir. 1967), *cert. denied*, 392 U.S. 905, 88 S.Ct. 2053, 20 L.Ed.2d 1363 (1968).

■ In light of the historical analysis discussed above, the Court finds nothing in these considerations upon which to conclude that it should employ the fiction of an official U. S. price of gold in converting the limitation sums expressed in the Convention. The only proper basis for determining defendant's liability limitation, at least since 1978,[46] is with reference to the free-market price of gold.

■ Because plaintiff has proved that the market price of gold had exceeded $400 an ounce by June 1978, defendant's tariff, which purports to limit its liability to $9.07 per pound, is null and void under Article 23 as a provision tending to fix a lower limit than that which is laid down in the Convention.[47] *See Saiyed v. Transmediterranean Airways*, 509 F.Supp. 1167 (W.D.Mich.1981).

The maximum recovery plaintiff seeks does not exceed defendant's liability limit converted at the free-market price of gold at the earliest relevant date in this case— the Air Waybill date of June 27, 1978.[48] Therefore, the Court need not address the secondary issues that defendant has raised: *e.g.*, whether to use the market price of gold at the time of the contract,[49] the accident,[50] the judgment,[51] or payment on the judgment;[52] and whether to use the Lon-

46. Most of the journal articles to date have addressed whether the market price of gold should prevail over an existing "official" price. *See* authorities cited in notes 12 & 13 *supra*. Without responding to the merits of these authors' arguments—whether the intent of the Convention is best served by applying an official price or a market price—the Court finds no support for application of an official price that was abolished in 1978. Indeed, the authors themselves admit as much. *See, e.g.*, Asser, *supra* note 12, at 666 (without an official gold price there "appears to be no logical solution"); Martin, *supra* note 13, at 75–76 (recommending legislative solutions to problem).

47. In so holding, the Court is aware that the liability limitations as to goods may be unrealistically high and that recent proposed amendments to the Convention would stabilize liability at approximately $9.07 per pound. *See* Bureau of Consumer Protection, Civil Aeronautics Board, *supra* note 13, at 5; *Aviation Protocols, Hearing Before the Senate Committee on Foreign Relations*, 95th Cong., 1st Sess. 47 (1977). The amendments, Montreal Protocols 3 and 4, were submitted to the United States Senate for ratification on Jan. 14, 1977, however, and no action has been taken since that time. *See Hearing, supra*, at 1; Sheinfeld, *From Warsaw to Tenerife: A Chronological Analysis of the Liability Limitations Imposed Pursuant to the Warsaw Convention*, 45 J. Air L. & Com. 653, 681 (1980). Ratification in the near future appears uncertain. *See* Martin, *supra* note 13, at 73–74, 76.

48. Plaintiff seeks a maximum recovery in damages, attorney's fees, and prejudgment interest of approximately $75,000. Defendant's liability under Article 22 for damage to the Analyzer, converted with reference to gold at $400 an ounce, is approximately $85.94 per pound, or $159,848.40. *See* Bureau of Consumer Protection, Civil Aeronautics Board, *supra* note 13, at 5.

49. Plaintiff suggests that using the date of contract for the conversion will avoid the administrative problems defendant foresees. "[T]he carrier can charge for goods or baggage . . . taking into account the market value of gold by on-line computer or periodically issued books, much as fares are done these days." Plaintiff's Additional Memorandum at 8.

50. A Swedish judge used this reference point. *See* note 45 *supra*.

51. Nations that adopted the Hague Protocol, *see* note 22 *supra*, are bound by an amendment to Article 22(4) that provides: "Conversion of the sums into national currencies other than gold shall, in the case of judicial proceedings, be made according to the gold value of such currencies at the date of judgment . . . ." *See* Asser, *supra* note 12, at 645, 649–50.

52. A leading treatise on the Convention criticizes this date as an unintended protection of judgment creditors. *See* H. Drion, *Limitation of Liability in International Air Law* 189–90 (1954).

don market, the Zurich market, or some other gold market quotation.

### C. Attorney's Fees

The Court finds that plaintiff has made the proper 30-day demand required under Texas law as a prerequisite to recovery of attorney's fees. *See* Tex.Rev. Civ.Stat.Ann. art. 2226 (Vernon 1960); *Jones v. Kelley*, 614 S.W.2d 95, 100 (Tex. 1981). The complaint itself contains a specific demand for payment, and it is an undisputed fact that defendant has not tendered payment. *See* Joint Pretrial Order at 8. Because defendant has been found liable under Texas law, *see* part II(B) *supra*, this Court, sitting in diversity, should follow the Texas law allowing recovery of attorney's fees in this case. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 259 n.31, 95 S.Ct. 1612, 1622 n.31, 44 L.Ed.2d 141 (1974).

The Court rejects defendant's contention that the Warsaw Convention preempts state law which would otherwise award attorney's fees. Article 24 provides that "any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention." Warsaw Convention art. 24(1). The Convention makes no mention of attorney's fees. Cases relied on by defendant in its brief turn on the Interstate Commerce Act's express provisions governing attorney's fees. *See, e.g., Nationwide Horse Carriers, Inc. v. Johnston*, 519 S.W.2d 163 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.). Moreover, it is clear that other nations party to this Treaty do not consider it to preempt awards of attorney's fees. *See* Lowenfeld & Mendelsohn, *supra* note 4, at 507–09 (discussing provision in Hague Protocol specifically removing awards of attorney's fees from the liability limitations).

The Court holds that allowing plaintiff recovery of reasonable attorney's fees, as provided by Texas law, does not contravene the "conditions and limitations set out in [the] Convention" in violation of Article 24(1). The Court has determined that a reasonable fee for prosecution of this case by plaintiff is $15,000, and so awards such amount.[53]

### D. Prejudgment Interest

Texas law clearly permits courts at their discretion to award equitable prejudgment interest as an element of damages. *Dallas-Fort Worth Regional Airport Board v. Combustion Equipment Associates, Inc.*, 623 F.2d 1032 (5th Cir. 1980); *Phillips Petroleum Co. v. Stahl Petroleum Co.*, 569 S.W.2d 480 (Tex.1978). Further, the trial court has discretion to choose the applicable rate and is not bound by the 6-percent rate applicable to written contracts and open accounts. *Dallas-Fort Worth Regional Airport Board*, 623 F.2d at 1042; *Larcon Petroleum, Inc. v. Autotronic Systems*, 576 S.W.2d 873 (Tex.Civ.App.—Houston [14th Dist.] 1978). *See* Tex.Rev.Civ.Stat.Ann. art. 5069–1.03 (Vernon 1971).

The Court holds that plaintiff is entitled to prejudgment interest from August 22, 1978, the date it received the damaged Analyzer, to the date of final judgment herein at the rate of 7 percent per annum.

The Amended Findings of Fact and Conclusions of Law filed previously by the Court herein are hereby incorporated and made a part of this Opinion. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, this Memorandum Opinion constitutes the Findings of Fact and Conclusions of Law by the Court.

---

**53.** The question whether attorney's fees might be subject to the limitations set out in Article 22 no longer exists in this case in light of the

Court's holding in part III(B) above. *See* note 48 *supra*; Drion, *supra* note 52, at 114–15.