**FRANKLIN MINT CORPORATION, Franklin Mint Limited, and McGregor, Swire Air Services Limited, Plaintiffs-Appellants,**

v.

**TRANS WORLD AIRLINES, INC., Defendant-Appellee.**

Docket 82–7012, No. 999.

United States Court of Appeals, Second Circuit.

Argued April 22, 1982.

Decided Sept. 28, 1982.

John R. Foster, New York City (Donald M. Waesche, Waesche, Scheinbaum & O'Regan, P. C., New York City, of counsel), for plaintiffs-appellants Franklin Mint Corp., Franklin Mint Ltd. and McGregor, Swire Air Services, Ltd.

John N. Romans, New York City (Robert S. Lipton, Scott J. McKay, Wolas, Curtis, Mallet-Prevost, Colt & Mosley, New York City, of counsel), for defendant-appellee Trans World Airlines, Inc.

(Robert B. Hemley, Norman Williams, Gravel, Shea & Wright, Burlington, Vt., of counsel), for amici-curiae Jacques Roulin and Hugh Harley.

Before OAKES, CARDAMONE, and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This is an appeal from a final judgment of the United States District Court for the Southern District of New York, Whitman Knapp, *Judge,* limiting the defendant's liability under the Warsaw Convention ("Convention")[1] for loss of cargo. In determining the limit in United States dollars, Judge Knapp utilized the last official price of gold as a unit of conversion and awarded plaintiffs $6,475.98. 525 F.Supp. 1288 (S.D.N.Y. 1981). Plaintiffs appeal, claiming the limit should have been calculated by other methods. While we agree with the result reached in this case and thus affirm, we hold the Convention's limit on liability prospectively unenforceable in United States Courts.

## SUMMARY OF THE ISSUES AND DECISION

The facts in this case, if nothing else, are clear cut. In March, 1979, plaintiffs Franklin Mint Corporation, Franklin Mint Limited, and McGregor, Swire Air Services Limited (collectively, "Franklin Mint") contracted with defendant Trans World Airlines, Inc. ("TWA") for the carriage by air from the United States to England of 714 pounds of numismatic materials. Though the articles were worth more than $6,500, Franklin Mint made no special declaration of value. The articles were either lost or destroyed, thus rendering TWA liable under Article 18 of the Convention.[2] Because of

---

1. The Warsaw Convention is formally known as the "Convention for the Unification of Certain Rules Relating to International Transportation by Air," opened for signature October 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (adherence of the United States proclaimed October 29, 1934).

2. Article 18 of the Convention reads:
   (1) The carrier shall be liable for damage sustained in the event of the destruction or loss of, or of damage to, any checked baggage or any goods, if the occurrence which caused the damage so sustained took place during the transportation by air.
   (2) The transportation by air within the meaning of the preceding paragraph shall comprise the period during which the baggage or goods are in charge of the carrier, whether in an airport or on board an aircraft,

the absence of a special declaration, TWA sought to limit its liability under Article 22 of the Convention.

Article 22 limits the carrier's liability for injuries to both "checked baggage and . . . goods" and "objects of which the passenger takes charge himself."[3] The various limits are stated in terms of a specified number of French gold or "Poincare" francs, a unit of account consisting of "65½ milligrams of gold at a standard fineness of nine hundred thousandths." The limit on baggage or other goods is 250 Poincare francs per kilogram. The dollar value of that limit is calculated simply by converting the gold value of the specified unit into United States dollars, e.g., the limit per kilogram is 250 multiplied by the dollar value of 65½ milligrams of gold.

The difficulty arises from the fact that when Article 22 was drafted, gold served official monetary functions and its price was set by law. The Convention thus selected it as the unit of conversion in order to ensure judgments of uniform value as well as a stable and easily calculable limitation on liability. The plain but highly troublesome fact is that by international agreement and United States domestic legislation gold has now lost its monetary functions and no longer has an official price. Unfortunately for parties to international airline transactions as well as for us, the terms of Article 22 continue to utilize gold as the unit of conversion. Thus, the parties raise the issue of what unit of account is now to be used to convert judgments under the Convention into United States dollars.

In arguing the issue, the parties offer four alternatives: (i) the last official price of gold in the United States; (ii) the free market price of gold; (iii) the Special Drawing Right ("SDR"), a unit of account established by the International Monetary Fund ("IMF") and recently proposed as a substitute for gold in the as yet unratified Montreal Protocols to the Convention; and (iv) the exchange value of the current French franc. While acknowledging that "the arguments in favor of . . . the SDR [were] most persuasive," Judge Knapp nevertheless held that the last official price of gold was the appropriate standard. This choice was predicated on the view that this standard "has been . . . espoused by the Civil Aeronautics Board ("CAB"), the government agency most intimately concerned with the transaction at hand," and has been "used by all domestic carriers—including TWA—in calculating the dollar value of the Article 22 limitation printed on their tariffs." 525 F.Supp. at 1289.

We share Judge Knapp's doubt about the result. Indeed, there are powerful argu-

---

or, in the case of a landing outside an airport, in any place whatsoever.

(3) The period of the transportation by air shall not extend to any transportation by land, by sea, or by river performed outside an airport. If, however, such transportation takes place in the performance of a contract for transportation by air, for the purpose of loading, delivery or transshipment, any damage is presumed, subject to proof to the contrary, to have been the result of an event which took place during the transportation by air.

3. Article 22 of the Convention reads:

(1) In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of 125,000 francs. Where, in accordance with the law of the court to which the case is submitted, damages may be awarded in the form of periodical payments, the equivalent capital value of the said payments shall not exceed 125,000 francs. Nevertheless, by special contract, the carrier and the passenger may agree to a higher limit of liability.

(2) In the transportation of checked baggage and of goods, the liability of the carrier shall be limited to a sum of 250 francs per kilogram, unless the consignor has made, at the time when the package was handed over to the carrier, a special declaration of the value at delivery and has paid a supplementary sum if the case so requires. In that case the carrier will be liable to pay a sum not exceeding the declared sum, unless he proves that that sum is greater than the actual value to the consignor at delivery.

(3) As regards objects of which the passenger takes charge himself the liability of the carrier shall be limited to 5,000 francs per passenger.

(4) The sums mentioned above shall be deemed to refer to the French franc consisting of 65½ milligrams of gold at the standard of fineness of nine hundred thousandths. These sums may be converted into any national currency in round figures.

ments against each of the proffered solutions. The last official price of gold is a price which has been explicitly repealed by the Congress. See note 11, *infra,* and accompanying text. It thus lacks any status in law or relationship to contemporary currency values. The free market price of gold is the highly volatile price of a commodity determined in part by forces of supply and demand unrelated to currency values. SDR's are a creature of the IMF, modified at will by that body and having no basis in the Convention. The French franc is simply one domestic currency, subject to change by the unilateral act of a single government.

Every proffered solution thus appears to have a devastating argument against it. While the Convention has not been formally abrogated, enforcement by national judicial tribunals is impossible without their picking and choosing among alternative units of conversion according to their view of which is best as an initial policy matter. We have no power to select a new unit of account. We thus hold the Convention's limitation of liability unenforceable by United States Courts.

## BACKGROUND

Drafted in the late 1920's, the Convention was designed both to protect the fledgling aviation industry from the alternatives of ruinous damage suits or exorbitant insurance premiums and to insure a certain degree of uniformity of legal obligation given the expected international character of the industry. *See* A. Lowenfeld and A. Mendelsohn, *The United States and the Warsaw Convention,* 80 Harvard L.Rev. 497, 499–501 (1967) (hereafter "Lowenfeld and Mendelsohn"); *see also Reed v. Wiser,* 555 F.2d 1079, 1089 (2d Cir.), *cert. denied,* 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977) *and* CAB Staff Memorandum, Warsaw Convention Liability Limits, March 18, 1980, at 5–6. (App. at 43–44). A series of rules governing liability, affirmative defenses and limitations accomplished the former goal, while the Convention's international scope accomplished the latter. Articles 17, 18 and 19 enunciate the carrier's liability for personal injuries, for damage or loss of baggage, and for damage due to delay. Articles 20 and 21 establish as affirmative defenses lack of fault and contributory negligence. Finally, Article 22 provides a limitation on the extent of liability for both personal injury and loss of luggage or other goods.

The personal injury limitations amounts have been subject to upward revision from time to time through protocols to the original agreement. These revisions have come in the wake of a continuing debate, with the developed countries, notably the United States, Great Britain and France, arguing for higher limits, and the less developed nations seeking reduction of the existing limit.[4] Lowenfeld and Mendelsohn at 504. Throughout this period, the level of the limitations on liability for loss or destruction of checked baggage and other goods has remained the same.

4. In 1955, at The Hague, the conferees would agree only to a doubling of the limit to 250,000 Poincare francs or $16,600. Lowenfeld and Mendelsohn at 504–09. The United States unenthusiastically signed the Hague Protocol a year later, but did not present the treaty to the Senate until July 1959. Lowenfeld and Mendelsohn at 515. The Senate never consented to the Protocol because of its low limit, however, and ultimately the Kennedy/Johnson Administrations actually threatened United States denunciation of the Convention. This threat came in the wake of Congress' failure to enact a legislative package ratifying the Hague Protocol while compelling the purchase by all American air carriers of $50,000 in insurance for each passenger. To avoid United States denunciation, a conference met in Montreal in the spring of 1966. The result of this meeting was the so-called Montreal Agreement "which provided for absolute carrier liability up to $75,000 on all flights into or out of the United States." *Reed v. Wiser,* 555 F.2d at 1087. Appeased, the United States withdrew its denunciation. However, it continued to press for an amendment to the Convention raising personal injury liability limits. In 1971, the parties promulgated the Guatemala City Protocol under which personal injury limits were to be raised to $100,000 at the then current exchange rate of $35 per ounce of gold." *Id.* at 1089 n.12. However, the United States has not ratified that protocol.

Defining recoveries in terms of a specified amount of gold was intended to produce stability and uniformity. Such a common standard allowed the conversion of liability limits into national currencies and insulated recoveries from the vicissitudes of currency fluctuation and devaluation. In drafting the Convention, a proposal to fix recoveries purely in terms of the French franc was rejected by Switzerland on the ground that use of a single national currency rendered the liability limit subject to change by the act of one government. *See* Second International Conference on Private Aeronautical Law, Minutes, October 4–12, 1929, Warsaw, at 88–89 (Horner and Legrez trans. 1975), (App. at 247–248). As the Swiss delegate put it, "Naturally one can say 'French franc' but ... its [France's] national law which determines it, and one need have only a modification of the national law to overturn the essence of this provision." *Id.* at 89–90, (App. at 248–249). Accordingly, the Swiss pressed for a standard which tied the limitation to a gold value regardless of the national currency actually named in the article. *Id.* at 90, (App. at 249). The conferees accepted the Swiss position and stated the limitation in terms of the Poincare franc defined as "65½ milligrams of gold at a standard fineness of nine hundred thousandths." Convention, art. 22 § (4).[5]

From October, 1934, when the United States first adhered to the Convention, until 1978, use of gold as the unit of account posed no problem for United States Courts or the judicial tribunals of other signatory nations. In 1934, the value of gold was set at $35 per troy ounce pursuant to statute, United States Gold Reserve Act of 1934, Pub.L.No.73–87, 48 Stat. 337 (1934). When the United States became a party to the International Monetary Fund (IMF) in 1945, *see* Bretton Woods Agreements Act, ch. 339, § 2, Pub.L.No.79–171, 59 Stat. 512 (1945) (codified at 22 U.S.C. § 286 (1976)), it promised to maintain (and, if necessary, redeem) the value of United States dollars in terms of gold. For purposes of the Convention's limits on liability, therefore, the relationship of gold and the dollar allowed judicial tribunals to award judgments on a stable, uniform basis.

At the time of Bretton Woods, the United States dollar was grossly undervalued and was actually an asset more valuable than gold. The promise to redeem all dollars in gold could thus be made without having to be fulfilled.[6] From 1955, however, the United States faced a persistent balance of payments deficit. Where once there existed a dollar shortage, there now developed a dollar glut.[7] To compensate, central banks abroad began trading their dollars for gold, and hoarders and speculators began accumulating the metal in increasing amounts. From 1955 to 1968, United States gold reserves plummeted from approximately $24 billion to around $10 billion.[8]

These events led ultimately to the demise of the gold standard. In early 1968, depletion of the United States gold reserve led the central banks of Belgium, the Federal Republic of Germany, Italy, the Netherlands, Switzerland, the United Kingdom and the United States to agree to discontinue supplying gold to private markets. A so-called "two-tier" system of gold pricing—a market price set accordingly and the

---

**5.** There was only one change made in this standard at the Hague in 1955. To avoid any confusion, the conferees deleted reference to the Poincare franc and defined the specified sums as referring "to a *currency unit* consisting of sixty-five and a half milligrams of gold of millesimal fineness nine hundred." Asser, *Golden Limitations of Liability in International Transport Conventions and the Currency Crisis,* 5 J.Mar.L. & Com. 645, 647–48 n.7 (1974). Since the United States never ratified the Hague Protocol, the old language still governs American courts. That change, however, is entirely formal, since the elimination of any reference to the French franc merely clarified the Convention's desire to use gold, a point never doubted in the United States.

**6.** *See* P. Samuelson, *Economics,* 686–88 (8th ed. 1970).

**7.** *Id.* at 690–91.

**8.** *Id.* at 691, Figure 36–1.

official price set under Bretton Woods[9] —was thus created. This eased the pressure but could not remedy the essential flaw. In addition to persistent United States balance of payment deficits, international gold reserves grew more slowly than the volume of world economic activity. As a consequence, banks faced pressures to liquidate official holdings in light of readily available market profits. The stage was thus set for abandonment of the Bretton Woods arrangements.

In August, 1971, the United States suspended its commitment to convert dollars for gold.[10] In May, 1972, it devalued the dollar by raising the official price of gold to $38 per ounce. *See* Par Value Modification Act, Pub.L.No.92–268, § 2, 86 Stat. 116 (1972) (formerly codified at 31 U.S.C. § 449 (1972)). In October, 1973, yet another devaluation raised the price to $42.22 per ounce. *See* Par Value Modification Act, amendments, Pub.L.No.93–110, § 1, 87 Stat. 352 (1973) (formerly codified at 31 U.S.C. § 449 (1976)).

The dollar's troubles led the IMF to put forth a plan to abolish the official price of gold, to delete references to gold in its articles, and to substitute SDR's as .the Fund's reserve asset and unit of account. The plan was proposed in the 1976 Jamaica Accords, was passed by the Fund's members and became effective April 1, 1978. In the interim, the United States passed imple-

menting legislation including a repeal of the Par Value Modification Act of 1973 and the abolition of the official price of gold.[11] Along with the Jamaica Accords, the measure also became effective on April 1, 1978.

This radical change in the international monetary system created an obvious problem under the Warsaw Convention. With gold abandoned as a currency base and the official price repealed, gold became a commodity with a daily fluctuating free market price. That the difficulty in continuing to use gold as a monetary base undermined the Convention's unit of conversion was immediately recognized. Thus, the Warsaw conferees met in Montreal in 1975, even before the Jamaica Accords, and drafted and signed a Protocol substituting SDR's as the Convention's unit of conversion. At the time of the proposal, the SDR was calculated in terms of gold.[12] With the Jamaica Accords, the referent was changed to a basket of 16 national currencies, and in January, 1981, the basket was reduced to five currencies.[13] The Montreal Protocol was presented to the United States Senate in January, 1977 but has not been approved.

Meanwhile, parties to the Convention have utilized a variety of units of conversion. The record shows Sweden and Britain have adopted SDR's for purposes of Warsaw.[14] Both a Netherlands court and the Civil Court of Rome reached the same result.[15] Two French courts have recently

9. *See* Asser, *supra* note 6, at 650; Gold, *International Monetary Law: Change, Uncertainty and Ambiguity,* 15 J. Int'l L. & Econ. 323, 340–41; Samuelson, *supra* note 7, at 698–99.

10. *Id.* at 641; Asser, *supra* note 6, at 651.

11. In repealing the official price generally, Congress retained its use for the limited purpose of determining the value of gold held in the form of gold certificates. See 31 U.S.C. § 405b. The Senate noted that this was the "only domestic purpose for which it is necessary to define a fixed relationship between the dollar and gold . . . ." S.Rep.No.1295, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5935, 5966–67.

12. Gold, *supra* note 10, at 345.

13. Ward, *The SDR in Transport Liability Conventions: Some Clarifications,* 13 J. Mar. L. & Com. 1, 3 (1981).

14. *See* Sweden's Carriage by Air Act (1957), amendment to Chapter 9, § 22, effective April 27, 1978, (translated and reprinted in App. at 57–61); *see also* the British Carriage by Air (Sterling Equivalents) Order of 1980, Statutory Instrument 1980 No. 281, effective March 21, 1980, (reprinted in App. at 62–63).

15. *State of the Netherlands v. Giant Shipping Corp.,* Rechtspraak van de Week, 30, May, 1981, 321 (Supreme Court of the Netherlands, May 1, 1981) (translated and reprinted in App. at 64–93); *Linee Aerea Italiane v. Ricciole* (Rome Civil Court Judgment 609/1979, Nov. 14, 1978), (translated and reprinted in App. at 95–108).

decided that the Warsaw unit is to be converted simply into the current French franc.[16] The United States District Court in the Southern District of Texas recently opted for the free market price of gold,[17] the standard utilized by an Indian court,[18] and a Greek court.[19] Finally, the last official price of gold, chosen by the District Court in this case, was relied upon by Judge Sifton in *In re Air Crash Disaster at Warsaw Poland on March 14, 1980,* 535 F.Supp. 833 (E.D.N.Y.1982) and is still utilized by the CAB pursuant to a 1974 order.

## DISCUSSION

The controlling facts in this case are: (i) enforcement of the Convention's limitation on liability requires a unit of conversion to translate judgments into domestic currency; (ii) there is no longer an internationally agreed upon unit of conversion; and (iii) there is no United States legislation specifying a unit to be used by United States Courts.

The need for a unit of conversion is self-evident. Without it, a rational limit on liability cannot exist, much less one which produces judgments of equal value in different currencies.

The lack of an internationally agreed upon unit is also obvious. The very convening of the Montreal meeting in 1975 was a recognition by the Warsaw parties that the Convention's unit had been eliminated by events. In plain fact, different countries now apply different units. Although the alternatives argued before us yield limitations on TWA's liability in this case ranging from less than $6,500 to over $400,000, each has been adopted as the proper unit of

account by at least one party, or domestic tribunal of a party, to the Convention. This disarray merely confirms the obvious fact that the Jamaica Accords destroyed the international arrangements which had led to adoption of gold as a unit of conversion.

International disarray is also reflected in the lack of legislation in the United States implementing the Convention by establishing a unit of conversion. While the "last" official price of gold is offered as a possible unit, "last" is really a euphemism for "no longer" or "repealed." The repeal of the Par Value Modification Act in 1978 was in every sense a legislative declaration that the price of $42.22 per troy ounce was no longer recognized by the United States.[20] We fail to see the logic in adopting as a legal standard a specified value for gold which has been specifically rejected by the United States Congress. Congress' action, moreover, as well as that taken by the other parties to the Jamaica Accords, is highly relevant to the Convention. The repeal of the Par Value Modification Act was based on a domestic and international conclusion that the official price of gold was wholly out of touch with economic and monetary reality. Since use of a fixed amount of gold as the Convention's unit was specifically designed to establish a limitation level at a certain value, this repeal must be taken as a statement that the official price no longer reflects that specified value. The case for continuing to use the now repealed price of gold thus finds no support in law or logic.

The CAB order on which Judge Knapp relied was expressly premised on the existence of an official price under the Par Value Modification Act of 1973. The more recent internal CAB memorandum support-

16. *See Chamie v. Egyptiar* (Cours d'appel Paris, Jan. 31, 1980) (translated and reprinted in App. at 171–91); *Pakistan Int'l Airlines v. Compagnie Air Inter. S. A.,* (Cours d'appel Aix-en-Provence Oct. 31, 1981) (translated and reprinted in App. at 156–70).

17. *Boehringer Mannheim Diagnotecs, Inc. f/k/a Hycel, Inc. v. Pan American World Airways, Inc.,* 531 F.Supp. 344 (S.D.Tex.1981).

18. *Kuwait Airways Corp. v. Sanghi,* Regular Appeal No. 54 of 1977 (Civil Station, Banga-

lore, India, August 11, 1978) (reprinted in App. at 265–71.)

19. *Zakoapolos v. Olympic Airways Corp.,* No. 256 of 1974 Ct. of App.; 3d Dep't., Athens, Greece (February 15, 1974) (translated and reprinted in App. at 251–54.)

20. The sole remaining use of the last official price is in determining the value of gold held in the form of gold certificates. *See* note 12, *supra.* That is not relevant to the issues here.

ing continuation of that order is based ultimately on a policy determination that the last official price is the best available standard.[21] The inconsistency of the CAB position, however, is starkly evident. It rejects SDR's because the Senate has not approved the Montreal Protocol, while adopting the last official price of gold which has been explicitly rejected by the Congress. The sole criterion supporting the CAB's position appears to be the law of inertia.

The other alternatives have an equally infirm base. Neither the free market price of gold nor the current French franc was ever agreed to by the treaty's framers, both are gross departures from its purposes, and, as to the latter, there is ample evidence that it was specifically rejected. The framers clearly contemplated use of the governmentally fixed price of gold in adopting it as a unit of account in the hope of providing stability.[22] The free market price of gold, however, is simply the daily fluctuating price of a commodity, affected by conditions relating to supply and nonmonetary uses affecting demand. The current French franc is similarly flawed. To enforce it would amount to a deliberate departure from the expressed wishes of the framers to avoid the use of a single national currency subject to unilateral action.

TWA argues that we should adopt the International Monetary Fund's SDR as the unit of conversion. It is true that the SDR was "created by the IMF in 1969 to replace gold and foreign exchange as an international reserve asset."[23] "[M]ember central banks may exchange SDR's for other convertible currencies and, therefore, SDR balances are actually lines of credit against which reserves may be borrowed for use in central bank operations."[24] As noted above, methods of calculating SDR's have been changed from time to time. They are

presently calculated with reference to a so-called basket of five currencies—the U. S. dollar, the Deutsche mark, the French franc, the Japanese yen, and the pound sterling. The amount of each currency in one SDR is a function of the percentage weights which are assigned to each currency in the basket. The dollar value of one SDR is then determined by adding the "dollar values of each currency component based on daily market exchange rates."[25]

Though the value of any one currency in terms of SDR's fluctuates from day to day, SDR fluctuations are generally less extreme than fluctuations in the free market price of gold. The relative stability of the SDR has thus led the Warsaw signatories to propose its substitution as the Convention's unit of account. The proposal was formally drafted in 1975 as part of the Montreal Protocols to the Convention and has been presented to the signatory states for ratification. Though the substitution was supported by the United States, there has been opposition by non-IMF signatories and very few signatories (the United States included) have actually ratified the Protocol.

The inappropriateness of our adopting SDR's as the unit of conversion is plain. The Convention itself contains not the slightest authority for its use and the Senate has thus far declined to ratify the Montreal Protocols. Moreover, the decision in principle to use SDR's is only the first step. After that, a further step must be taken to define the limitation of liability in terms of a particular number of SDR's per kilogram of baggage. In effect, we would have to set the level of the limitation. Finally, the SDR is a creature of an international body, the IMF, and is subject to modification or outright elimination by that body. In fact, the method of calculating SDR's has been

21. CAB Internal Memorandum, Warsaw Convention Liability Limits, May 20, 1981 (App. at 32–38).

22. Appellant's reliance on dicta in our decision *Reed v. Wiser,* 555 F.2d at 1089 n.12, is misplaced. The *Reed* footnote implied a free market standard under the Guatemala City Protocol which the U.S. has not ratified.

23. Ward, *supra* note 14, at 2.

24. *Id.*

25. *Id.* at 3.

changed three times in the last seven years. This Court has no power under the terms of the Convention or relevant domestic source of authority to adopt a unit of conversion variable at the whim of an international body distinct from the parties to the Convention.

It is thus clear that neither international nor domestic sources of law specify a unit of account for purposes of the Convention. We deal here not with ambiguities which may be clarified by reference to underlying purpose or with language which inadequately mirrors the understood intentions of the drafters. For almost two generations, the Convention's limits on liability have been translatable into domestic currency values by application of a clear and easily applied formula. An essential ingredient of that formula has, as a consequence of international action followed by domestic legislation, ceased to exist. What the parties ask us to do is to select, upon the basis of our judgment as to what is best as a matter of policy, a new unit of conversion. We are without authority to do so.

■ Treaty advice and consent and proposal is the province of the executive and ratification is the exclusive province of the United States Senate. U.S.Const. art. II, § 2, cl. 1; *Doe ex dem. Clark et al. v. Braden,* 16 How. 635, 656–57, 14 L.Ed. 1090 (1853). While federal courts are necessarily called upon to interpret treaties, *The Federalist* No. 3 (J. Jay) (Rossiter ed. 1961); *see also id.* No. 80 (A. Hamilton), they must observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other. *See Baker v. Carr,* 369

U.S. 186, 211–12, 82 S.Ct. 691, 706–07, 7 L.Ed.2d 663 (1961). To be sure, great difficulty may arise in ascertaining where that line is drawn and when it has been crossed.[26] *See, e.g., Goldwater v. Carter,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). However, selection of a unit of conversion and the level of value of a limitation on liability is plainly a matter to be negotiated by the parties, as the history of the Convention demonstrates.

■ While international disarray as to the proper unit of conversion under the Convention alone might not disable us from enforcing a new unit, such a unit must be selected either through treaty approval by the Senate or by legislation passing both Houses of the Congress. The repeal of the Par Value Modification Act was an explicit abandonment of the previously established unit of conversion. While Congress may not have focused explicitly upon the Convention in repealing that Act, its purpose, abandonment of a price which was out of touch with economic reality, plainly encompasses use of that price to convert judgments to United States currency values. Congress thus abandoned the unit of conversion specified by the Convention and did not substitute a new one. Substitution of a new term is a political question, unfit for judicial resolution. We hold, therefore, that the Convention's limits on liability for loss of cargo are unenforceable in United States Courts.[27]

## CONCLUSION

■ This ruling is prospective and will apply only to events creating liability occurring 60 days from the issuance of the man-

---

**26.** Given the lack of an internationally agreed upon standard of conversion, it might be argued that the Convention has been abrogated. However, treaties involve international obligations entered into by coordinate branches of the government and it is not the province of courts to declare treaties abrogated or to afford relief to those (including the parties) who wish to escape their terms. These are not matters for "judicial cognizance." *Whitney v. Robertson,* 124 U.S. 190, 194, 85 S.Ct. 456, 458, 31 L.Ed. 386 (1887); *see also Terlinden v. Ames,* 184 U.S. 270, 22 S.Ct. 484, 46 L.Ed. 534 (1901).

They belong to the executive and legislative departments because they are more properly the domain of "diplomacy and legislation, ... not ... the administration of laws." *Whitney v. Robertson,* 124 U.S. at 195, 8 S.Ct. at 458.

**27.** The Convention establishes liability as well as limits it. Note 2, *supra.* Our holding is limited solely to the unenforceability of the limits and we express no view as to the severability of those limits from the rest of the Convention.

date in this case. Prospective effect is compelled by the fact that this is the first case in which a court has declined to enforce the Convention's limits on liability. The parties assumed our power to select a new unit and thus our "resolution was not clearly foreshadowed." *Chevron Oil Co. v. Huson,* 404 U.S. 97, 106, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971). Parties to transactions covered by the Convention should have time to adjust their affairs to this ruling. *Cf. Northern Pipeline Construction Co. v. Marathon Pipeline Co.,* —— U.S. ——, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (judgment holding Bankruptcy Act unconstitutional stayed until October 4, 1982). As to events occurring before that date, we hold that the last official price of gold shall be used to calculate the limits on liability. Because of both the CAB ruling discussed above and the lack of alternatives, air carriers, at least in this country, have relied on the last official price of gold. All carriers have thus filed tariffs that comply with that standard and substantial "injustice and hardship" would result were they not allowed time to reformulate those tariffs. Other parties may continue to protect themselves through insurance.

Affirmed.