**In re AIRCRASH AT KIMPO INTERNATIONAL AIRPORT, KOREA ON NOVEMBER 18, 1980.**

**No. MDL–482.**

United States District Court,
C.D. California.

Feb. 15, 1983.

Lee S. Kreindler, Marc S. Moller, Kreindler & Kreindler, New York City, James Butler, Butler, Jefferson, Dan & Allis, Brien F. McMahon, Johnsen, Manfredi & Thorpe, Marc Brauer, Joel B. Kelman, Ronald A. Knell, Los Angeles, Cal., Christian R. Van Deusen, Santa Ana, Cal., Robert B. Ingram, San Rafael, Cal., Shannon Stafford, Stafford, Frey & Mertel, Seattle, Wash., Pat Maloney, San Antonio, Tex., for plaintiffs.

George N. Tompkins, Jr., Frank A. Silane, Condon & Forsyth, Los Angeles, Cal., for Korean Airlines.

### MEMORANDUM OPINION

HATTER, District Judge.

### BACKGROUND

On November 18, 1980, a Korean Air Lines ("Korean") jet crashed after a flight from the United States to Kimpo International Airport near Seoul, Korea. Several passengers, including plaintiffs' decedents, were killed. Others, including some plaintiffs, were injured. They now seek to recover damages.

The issues presented to this court are 1) whether the Warsaw Convention ("Convention") limits the damages recoverable for death or personal injury that results from an accident involving an international air carrier, and 2) the method of calculating damages if the Convention is applied.

The plaintiffs urge this court to strike the defense of the Convention's limitation on liability, asserting that, *inter alia,* there was insufficient notice of the applicability of the Convention to that particular flight and California's Wrongful Death Statute, Cal.Code Civ.Proc. § 377, provides the plaintiffs an independent basis for suit. Alternatively, plaintiffs suggest that, if the Convention is applicable, the method of converting the limitation into dollars should be based upon the free market price of gold, rather than any of the other possible conversion methods discussed below.

*The Warsaw Convention*

The Convention is a multilateral treaty drafted in 1929 and adhered to by most countries that have international airlines. The United States adhered to the Convention in 1934. 49 Stat. 3000 (1934). A primary purpose of the Convention is to limit the liability of international air carriers in the event of an accident or loss.

Article 22 sets a limit of 125,000 "Poincare" francs as damages for injury to passengers. Article 22(4) defines the franc as a gold coin consisting of 65.5 milligrams of gold "which may be converted into any national currency in round figures." The dollar value is calculated by converting the gold value into United States dollars. In 1965, this represented a ceiling on damages of $8,291.88. The United States expressed dissatisfaction with this low amount and gave the necessary six month's notice to formally denounce the Convention.

As a result, the international carriers met in Montreal and drafted the Montreal Agreement ("Agreement"), which provides that the airlines accept absolute liability for injury to passengers up to a limit of $75,000 per passenger. The Agreement is a special contract under Article 22 which allows the parties to agree to a higher limit than that provided for by the Convention. However, Article 23 prohibits "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than ... this convention ...." Therefore, Article 22, or special contracts allowed by it, cannot be a vehicle to reduce the liability of a carrier below the Convention limits. The Civil Aeronautics Board ("CAB"), in Order No. E–23680, 31 Fed. Reg. 7302 (1966), ordered carriers to use this higher limit if the point of departure or a planned stop was in the United States.

It should be noted that not all airlines or countries are parties to the Agreement. If they are not, the Convention's lower limits are still applicable. Furthermore, some parties, including Korea but not the United States, are parties to the Hague Protocol of 1955, which doubled the Convention limits to 250,000 Poincare francs.

Two other protocols, the Guatemala Protocol and the Montreal Protocol, contain amendments to Article 22 changing the unit of reference from the Poincare franc to the Special Drawing Right ("SDR") of the International Monetary Fund ("IMF"). However, these protocols have been ratified by very few countries. The United States Senate has not ratified either.

*The Gold Standard*

When the Convention was drafted, gold served official monetary functions internationally, and its price was set by law in most countries, including the United States. It was selected as the unit of conversion to ensure judgments of uniform value as well as a stable and easily calculable limitation on liability.

In 1976, Congress repealed Section 2 of the Par Value Modification Act, 31 U.S.C. § 449, thus abolishing the official price of gold. However, the CAB and the airlines in the United States continued to rely upon the last official price as the method to determine liability under the Convention.

However, other parties to the Convention have chosen other conversion methods. French courts have held that the current French franc is comparable to the Poincare franc and is to be used as the measure of liability under the Convention.[1] The SDR has been adopted legislatively by Britain[2] and Sweden[3] and by court decisions in the Netherlands[4] and Italy[5]. Courts in India[6]

---

1. *See, Chamie v. Egyptiar* (Cours d'appel Paris, Jan. 31, 1980); *Pakistan Int'l Airlines v. Compagnie Air Inter. S.A.,* (Cours d'appel Aix-en-Provence Oct. 31, 1981).

2. The British Carriage by Air (Sterling Equivalents) Order of 1980, Statutory Instrument 1980 No. 281, effective March 21, 1980.

3. Carriage by Air Act (1957), amendment to Chapter 9, § 22, effective April 27, 1978.

4. *State of the Netherlands v. Giant Shipping Corp.,* Rechtspraak van de Week, 30, May, 1981, 321 (Supreme Court of the Netherlands, May 1, 1981).

5. *Linee Aerea Italiane v. Ricciole,* (Rome Civil Court Judgment 609/1979, Nov. 14, 1978).

6. *Kuwait Airways Corp. v. Sanghi,* Regular Appeal No. 54 of 1957 (Civil Station, Bangalore, India, August 11, 1978).

and Greece[7] and a United States District Court for the Southern District of Texas[8] have chosen the free market price of gold.

Because there are four units of conversion currently recognized, this court is asked to select the correct one. The four methods are: (1) the last official price of gold, (2) the free market price of gold, (3) the Special Drawing Right ("SDR") of the International Monetary Fund ("IMF"), and (4) the current French franc.

## DISCUSSION

Which of the four available units of conversion is to be used to measure liability under the Convention is an open question in this circuit. *In Re Aircrash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301, 1305 n. 2 (9th Cir.1982). However, a month after the Ninth Circuit decided *Bali,* the Second Circuit addressed that issue. *Franklin Mint Corp. v. Trans World Airlines, Inc.,* 525 F.Supp. 1288 (S.D.N.Y.1981), *aff'd* 690 F.2d 303 (2d Cir.1982). The *Franklin Mint* trial court had determined that the CAB's reliance on the last official price of gold was persuasive and ruled that that unit of measure was still applicable. The Second Circuit held that selection of a unit of conversion was a political question unfit for judicial resolution. Therefore, the Convention's limits on liability were rendered unenforceable. However, the court made its ruling prospective and otherwise affirmed the trial court.

In discussing three of the four currently available units of conversion, the Second Circuit noted:

> Neither the free market price of gold nor the current French franc was ever agreed to by the treaty's framers, and, as to the latter, there is ample evidence that it was specifically rejected.... The free market price of gold, however, is simply the daily fluctuating price of a commodity,

affected by conditions relating to supply and nonmonetary uses affecting demand. The French franc is similarly flawed.
>
> . . . .
>
> The inappropriateness of . . . adopting SDR's as the unit of conversion is plain. The Convention itself contains not the slightest authority for its use and the Senate has thus far declined to ratify the Montreal Protocols. Moreover, the decision . . . to use SDR's is only the first step. After that, a further step must be taken to define the limitation of liability in terms of a particular number of SDR's .... Finally, the SDR is a creature of an international body, the IMF, and is subject to modification or outright elimination by that body.

690 F.2d at 310.

After consideration of the fourth unit of conversion, the last official price of gold used by the court below, the Second Circuit held:

> The repeal of the Par Value Modification Act was an explicit abandonment of the previously established unit of conversion. While Congress may not have focused explicitly upon the Convention in repealing that Act, its purpose, abandonment of a price which was out of touch with economic reality, plainly encompasses use of that price to convert judgments to United States currency values. Congress thus abandoned the unit of conversion specified by the Convention and did not substitute a new one. Substitution of a new term is a political question, unfit for judicial resolution. We hold, therefore, that the Convention's limits on liability . . . are unenforceable in United States Courts.

690 F.2d at 311.

The well-reasoned, comprehensive *Franklin Mint* opinion has persuaded this court

---

7. *Zakoapolos v. Olympic Airways Corp.,* No. 256 of 1974 Ct. of App.; 3d Dep't., Athens, Greece (February 15, 1974).

8. *Boehringer Mannheim Diagnostics, Inc. f/k/a Hycel, Inc. v. Pan American World Airways, Inc.,* 531 F.Supp. 344 (S.D.Tex.1981).

that, indeed, the limitation on damages that is imposed by the Convention is unenforceable.

The Second Circuit made its decision prospective, expressly limiting its effect to events occurring at least 60 days from the decision. 690 F.2d at 312. However, in its discussion the court noted:

> The need for a unit of conversion is self-evident. Without it, a rational limit on liability cannot exist, much less one which produces judgments of equal value in different currencies.
>
> The lack of an internationally agreed upon unit is also obvious. The very convening of the Montreal meeting in 1975 was a recognition by the Warsaw parties that the Convention's unit had been eliminated by events.

690 F.2d at 309.

It is clearly established that the airlines knew that "a rational limit on liability cannot exist" without an internationally agreed upon unit and "the Montreal meeting in 1975 was a recognition by the Warsaw parties that the Convention's unit had been eliminated." Therefore, airlines, including Korean, presumptively knew that this "international disarray" would prevent the Convention from shielding them in any rational manner, and they would be expected to protect themselves and obtain additional insurance.

Furthermore, the knowledge of this "international disarray" and the "recognition by the Warsaw parties that the Convention's unit had been eliminated by events," contrary to the holding in *Franklin Mint,* would allow the airlines to see—as early as 1975—that, eventually, a court would refuse to enforce the Convention. Therefore, this Court's decision as to the enforceability of the Convention is applicable to this action.

On the basis of the unenforceability of the damages limitation imposed by the Convention, the plaintiffs' motion to strike the defense of the Warsaw Convention is granted.