MASCHINENFABRIK KERN,
A.G., Plaintiff,

v.

NORTHWEST AIRLINES, INC. and J.E.
Bernard & Co., Inc., Defendants.

No. 81 C 656.

United States District Court,
N.D. Illinois, E.D.

April 5, 1983.

Abraham A. Diamond, Margaret Muller Wilson, Abraham A. Diamond, Ltd., Chicago, Ill., for plaintiff.

Susan L. Walker, H. Roderic Heard, Wildman, Harrold, Allen & Dixon, John P. MacRae, Lord, Bissell & Brook, Sherwin D.

Abrams, Solomon, Rosenfeld, Elliott, Stiefel & Abrams, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

WILLIAM T. HART, District Judge.

The plaintiff Maschinenfabrik Kern, A.G. ("Kern") filed this action against defendants Northwest Airlines, Inc. ("Northwest") and J.E. Bernard & Co. ("Bernard") in the United States District Court for the Northern District of Illinois. Kern seeks contract damages in the amount of $74,171.00 for injury to its duplicating machines during air shipment from the United States to Switzerland. The fact and extent of damage on delivery is undisputed. Bernard and Northwest, however, disclaim any liability for the damage. Northwest's disclaimer is made under the notice provision of the Warsaw Convention. 49 U.S.C. § 1502 note, Art. 26.[1] In the event it is found liable, Northwest also seeks a limitation of liability under Article 22 of the Convention. Bernard and Northwest cross claim against each other seeking indemnification and Bernard has filed a third party complaint against Cheshire, Co. ("Cheshire"). Subject matter jurisdiction is predicated on 28 U.S.C. § 1332(a)(2)[2] and 28 U.S.C. § 1337.[3] Venue in this district is proper.

Presently before the Court is Northwest's motion for summary judgment. For the reasons given below, Northwest's motion is denied. Summary judgment is granted in favor of Kern on the issue of liability as against Northwest. The Court finds that the only proper way to limit liability in accordance with the policy of the Warsaw

[1.] The Warsaw Convention, formally known as the "Convention for the Unification of Certain Rules Relating to International Transportation by Air," is a multilateral Convention for the unification of certain rules relating to international transportation by air, concluded at Warsaw, on October 12, 1929. 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11. Both the United States and Switzerland are parties. Adherence of the United States was proclaimed on October 29, 1934.

[2.] 28 U.S.C. § 1332(a)(2) provides that "the district courts shall have original jurisdiction of all

civil actions where the matter in controversy exceeds ... $10,000.00 ... and is between ... citizens of a state, and foreign states or subjects thereof."

[3.] 28 U.S.C. § 1337 provides that "the district courts shall have original jurisdiction of any civil action ... arising under any Act of Congress regulating commerce or protecting trade." The instant action arises under the Federal Aviation Act of 1958, 49 U.S.C. § 1301 et seq.

convention is at $9.07 per pound of damaged goods, by reference to the last official price of gold. Nonetheless, Northwest's motion for partial summary judgment on the issue of liability limitation is denied. Kern's charge that Northwest's conduct is wilful and an exception to the liability limitation is inappropriately decided by summary disposition. Whether Bernard or Cheshire are liable to Kern, or whether any of the parties must indemnify one another, remains to be resolved.

### Facts

Kern is a business entity organized under the laws of Switzerland and is a citizen of a foreign state. Northwest, a Minnesota corporation with its principal place of business in Minnesota, is a common carrier by air. Bernard, a New York corporation, with its principal place of business in Illinois, is a forwarder of freight over land. Cheshire, a subsidiary of Xerox Corporation, has its principal place of business in Mundelein, Illinois.[4]

The damaged duplicating machines, valued at $74,171.00, are Kern's property. Kern had loaned them to Cheshire to test their suitability for possible introduction into the United States market. Pursuant to the agreement between Kern and Cheshire, Cheshire was responsible for arranging to ship the machines back to Kern in Switzerland.

On or about January 29, 1979, Bernard received Kern's duplicating machines from Cheshire for shipping to Kern in Switzerland. On or about February 9, 1979, Bernard transferred the machines to Northwest, the carrier engaged to airship the machines to Kern. Northwest, however, was only one carrier in a chain of air carriers involved in the shipment of the machines. When the duplicating machines left O'Hare Airport in Chicago, Illinois, they travelled first via Northwest (the origin carrier), then on British Airways and finally on Swiss Air (the destination carrier). Neither Swiss Air nor British Air are named parties in this suit.

When the machines arrived in Switzerland, agents of Swiss Air noted damage to them and prepared a "cargo damage report." A cargo damage report is a pre-printed form designed to document any damage or loss sustained by goods during transportation. In addition to providing a place for general information, e.g., the airway bill number and last point of loading, a place is provided in which to indicate damage observed. In the instant case, the cargo damage report indicates that the duplicating machines were "broken," that the container in which the machines were crated also was "broken" and that the crates had no inner packing material. The report further recites that the damage was discovered during "an inbound check and customs clearance," although it does not indicate the country in which the machines were located when the damage was discovered.

On February 9, 1981, Kern sued Northwest and Bernard claiming damages in the amount of $74,171.00 plus costs. Since the machines' aggregate value is $74,171.00, the damage claimed is equivalent to total destruction of the machines.[5] In count I of its two-count complaint, Kern alleges that Northwest failed to deliver the duplicating machines in the same good condition as the machines allegedly were in when received by Northwest from Bernard. Alternatively, count II alleges that Bernard failed to deliver the duplicating machines to Northwest in the same good condition as the machines allegedly were in when received by Bernard from Cheshire.

Apparently, none of the defendants dispute the nature and extent of the damage to the duplicating machines. Northwest, however, denies all liability and raises two affirmative defenses. First, Northwest claims that it is not liable for any damage to the duplicating machines because Kern did not notify Northwest of such damage

---

4. Service of process could not be executed upon Cheshire. On June 20, 1982, a summons was personally served on the Xerox Corporation. Thus far Xerox has not answered or otherwise pled, although its attorney filed an appearance on July 20, 1982.

5. Actually the amount claimed is less salvage value.

within the seven day time period for notification required under Article 26 of the Warsaw Convention. Second, Northwest says that even if Northwest is liable for injury to the machines, its liability is limited under Article 22 of the Warsaw Convention to $9.07 per pound. That ceiling on liability would greatly diminish any recovery by Kern from Northwest.

Northwest and Bernard cross claim against each other. Northwest says that although Bernard delivered the machines to Northwest with an unremarkable airway bill, the airway bill prepared by Bernard falsely portrayed the condition of the machines. Rather Northwest admits that a panel of one machine was loose, that its legs had broken through the skids and that the machines were wrapped only in plastic and set on wooden skids. Northwest claims it told Bernard of the poor packaging and refused to accept the machines for shipment. Allegedly at Bernard's persistence, Northwest reexamined the packaging, recanted and shipped the machines. Northwest says that it marked the airway bill with an "exception" to indicate that the machines were defectively packed on receipt from Bernard.

Bernard also disclaims liability to Kern. Additionally, its crossclaim against Northwest states that it delivered the machines to Northwest in good order, as proved by the "clean" airway bill which accompanied the machines to Northwest's terminal. It is Bernard's position that the exception noted on the airway bill was added by Northwest to reflect an after-delivery injury to the machines. Bernard also filed a third party complaint against Cheshire. That complaint alleges that if the machines were delivered by Bernard to Northwest in damaged condition, the cause was some action or inaction by Cheshire in packing because Cheshire prepared the machines for shipment.

*Discussion*

I. *Notice Provision of Warsaw Convention: Article 26*

Northwest's motion for summary judgment is based on Kern's alleged failure to notify Northwest of the damage to the duplicating machines within the time specified by the Warsaw Convention. Article 26 of the Convention requires that notice of damage to goods must be made in writing to the carrier within seven days of the date of receipt of goods. Written notice is given either by writing upon a document of transportation or by a separate written notice. 49 U.S.C. § 1502 note Art. 26. Article 26(4) further provides that failure to comply with the written notice requirement shall prevent any action against the carrier for damage to goods transported by the carrier, absent fraud by the carrier. Since Northwest claims that it first received written notice of the damage several weeks later, Northwest says that Article 26(4) precludes any recovery by Kern from Northwest.

To the contrary, Kern argues that the Warsaw Convention only requires written notice to any one carrier among successive carriers so long as the transportation performed is considered a single transportation. 49 U.S.C. § 1502 note, Art. 1(3). Under this view, it is irrelevant that Northwest may not have received notice within seven days because Swiss Air, a successive carrier on a single trip, had timely notice. Kern submits that notice to Swiss Air is demonstrated by the cargo damage report prepared by Swiss Air's agent. That report was written before delivery of the machines to Kern, well within the seven day notice period.

The Court first must decide whether Article 26 should be construed to require notice to all successive carriers, including the origin carrier, or whether notice to any successive carrier will suffice. Article 26(2) requires that

> [in] case of damage, the person entitled to delivery must complain to *the carrier* forthwith after the discovery of damage, and at the latest, within . . . 7 days from the date of receipt in the case of goods.

Thus, Article 26(2) does not specify whether the proper carrier to receive notice of damage is the "origin" carrier" (Northwest), the

"destination" carrier, (Swiss Air) or each carrier in the chain; it only requires that notice be given to "the" carrier.

Article 26 may be interpreted in two ways. The construction favored by Northwest is strict, satisfied only by giving written notice to each carrier. Conversely, Kern urges a liberal construction, satisfied by giving notice to any of the successive carriers involved in a single transportation of goods.

■ In deciding this issue, the Court is guided by the rules of treaty construction set out by the Fifth Circuit.

In construing [a] treaty, as other contracts, we give consideration to the intent of the parties so as to carry out their manifest purpose. . . . We proceed under the admonition that where a treaty admits of two constructions, one restrictive of and the other favorable to the rights claimed under it, the latter is preferred.

*Board of County Commissioners v. Aerolineas Peruansa,* 307 F.2d 802, 806–07 (5th Cir.1962). Clearly the more liberal construction is the one advanced by Kern. Modern air transportation often results in the use of many carriers for a single journey. Some of the carriers are unknown to the owner of goods shipped. It is reasonable, therefore, to conclude that written notice of damage to one carrier involved in the air transportation of the goods satisfies the written notice requirement under Article 26 of the Warsaw Convention.

Article 1(3) of the Convention supports the conclusion that notice to any one carrier is sufficient. Article 1(3) provides that transportation to be performed by several successive carriers shall be deemed to be one undivided transportation, if the parties regard it as a single operation. It is reasonable to conclude that the participants viewed the transportation of the duplicating machines from Illinois to Switzerland as a single operation. No separate contracts were entered into between Cheshire and Bernard, Bernard and Northwest, and Northwest and the successive air carriers. There is no evidence that there was any long break in the machines' journey, beyond the time required to off-load the machines from one carrier and onto the next. Thus, for the purposes of the Convention, the transportation of the machines from Illinois to Switzerland is a single transportation. If the journey is a unitary one, notice to Swiss Air within seven days should satisfy Article 26.

Furthermore, Article 30(3) provides that successive carriers shall be jointly and severally liable for damage sustained to goods during transportation. Thus, under Article 30(3) all air carriers who participate in a single shipment are potentially liable for damage sustained to the goods transported, irrespective of which carrier actually caused the damage. Arguably, the drafters of the Convention determined that it would be inequitable to compel the injured party to identify the precise carrier in a chain which caused the damage. This is especially true since the carriers, and not the owner of the goods, usually have exclusive control over the facts of damage. *See Dalton v. Delta Airlines, Inc.,* 570 F.2d 1244 (5th Cir.1978). Consequently, the injured party may sue all of the carriers involved with a single transportation of goods. The burden is on each carrier to absolve itself from liability.

The rationale underlying Article 30(3) is equally applicable to an interpretation of Article 26. Given the relatively short time period within which written notice must be given, it would be unfair, if not impossible, to force the damaged party to discover the "culprit" as a predicate to giving notice under Article 26.

■ The Court concludes that an equitable interpretation of Article 26, especially in light of Article 30(3) and Article 1(3), is that timely written notice to one carrier in the chain of a unitary transportation of damaged goods is sufficient. In effect, it is notice to all.

■ There is no merit to Northwest's argument that because Kern did not make Swiss Air a party to the instant action, the principles of Article 30(3) are inapplicable to Article 26. In Northwest's view, only "parties to a suit" are within the protection

of Article 26. The purpose of the notice requirement under Article 26, however, is to give those involved in the transportation of goods an opportunity to determine the cause of damage. *See Dalton v. Delta Airlines, Inc., supra; Hughes-Gibb & Co. v. Flying Tiger,* 504 F.Supp. 1239 (N.D.Ill. 1981). Kern's decision as to whom to sue is not determinative for the purpose of Article 26 notice.

■ There is still another reason why Northwest cannot disclaim notice of damage as a way of avoiding liability to Kern. Northwest had *actual notice* of at least possible damage to the duplicating machines even before the machines began their air trip to Switzerland. Northwest marked the airway bill it received from Bernard to indicate that the machines were poorly packaged. The agent decided to ship the machines, allegedly because if damaged, they likely would not be damaged further in shipment. Its agent also admits that a panel of one machine was loose and its legs protruding through the plastic. Thus, the purpose of Article 26, to give the carrier an opportunity to determine the cause of damage, is not thwarted. While Northwest may not have conclusively known that the machines were damaged when they left O'Hare, it certainly was on notice of a problem with the shipment and knew where to begin looking for the source of the damage.

■ For the reasons stated above, the Court denies Northwest's motion for summary judgment. Furthermore, the Court grants summary judgment in favor of Kern on the issue of Northwest's liability. The fact of damage is undisputed and there no longer is any genuine issue as to whether Kern made a proper notice of damage under Article 26. Fed.R.Civ.P. 56(a).

II. *Limitation of Liability: Article 22*

Northwest also seeks partial summary judgment as to the amount of damages that it can be required to pay to Kern. Article 22 of the Warsaw Convention limits a carrier's liability for damaged goods to 250 French gold francs per kilogram. That sum was to be converted "into any national currency in round figures." 49 U.S.C. § 1502 note, Art. 22(4). As of 1973, the conversion rate was approximately $9.07 per pound of goods. As the two duplicating machines weighed a total of 5,000 pounds, Northwest seeks a finding that the maximum amount for which it can be held is $45,850.00.

Kern opposes Northwest's suggestion for limiting liability by arguing that Article 22 is obsolete because the "gold standard" underlying the international monetary exchange system is defunct. Kern seeks to limit liability in reference to the current free market price of gold.

In order to understand either party's position, a brief review of the international monetary exchange system pursuant to the Warsaw Convention follows. At the time that Article 22 was enacted, the conversion from francs to dollars was contemplated in reference to gold and not to some national currency like the pound or the dollar. This was done in order to avoid fluctuations in the value of a particular national currency which might result from unilateral action by the government whose currency was selected as the peg in the liability clause. *See, e.g., Boehringer Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc.,* 531 F.Supp. 344, 347, 350 (D.C.Tex. 1981), and the authorities cited therein. In 1934, the United States established an official price of $35.00 an ounce for gold. Gold Reserve Act of 1934, ch. 6, § 12, 48 Stat. 342 (1934); Presidential Proclamation No. 2072, 48 Stat. 1730 (1934). Although that official price varied some, the policies of the International Monetary Fund ("IMF") kept the price of gold relatively stable for the next 40 years. IMF's relevant monetary policy was centered on a system of international currency exchange based on assigned par values of each nation's currency. The par values were tied to the dollar value of gold at $35.00 per ounce. *Boehringer Mannheim v. Pan American, supra,* at 350 n. 16. Adding to the stability of the price of gold was the ban prohibiting American citizens from dealing in gold. Gold Reserve Act of 1934, ch. 6, §§ 3, 6, 48 Stat. 340

(1930) (repealed by Par Value Modification Act of 1973, Pub.L. No. 93–110, 87 Stat. 353 (1973)).

Events in the late 1960's and early 1970's led to the 1971 decision by the United States to stop converting its dollar into gold reserves. *See* S.Rep. No. 678, 92d Cong.2d Sess. 4, *reprinted in* [1972] U.S.Cong. & Ad.News 2209, 2212. Thus, the U.S. dollar value for gold became hypothetical. At the same time, the use of the price of gold as the anchor of the IMF system of international currency exchange became doubtful. *Boehringer Mannheim v. Pan American, supra,* at 350 n. 29. There followed in 1971 and 1973 two devaluations of the United States dollar, Par Value Modification Act of 1972, Pub.L. No. 92–268, § 2, 86 Stat. 116 (1972); Par Value Modification Act of 1973, Pub.L. No. 93–110, § 1, 87 Stat. 353 (1973), and consequent increases in the "official" price of gold to $38.00 and $42.22 an ounce, respectively. Then, in 1973, the United States ratified an amendment to an IMF agreement to abolish the concept of an official price of gold. Act of Oct. 19, 1976, Pub.L. No. 94–564, 90 Stat. 2660 (1976). Finally, on April 1, 1978 the official price of gold was rescinded simultaneously with the effective date of the IMF amendments. *See* 22 U.S.C. § 286a note (Supp. II 1978).

Subsequent to the 1973 devaluation of the dollar, the Civil Aeronautics Board ("CAB") directed the airlines to set tariffs for limiting liability to reflect the new "official" price of gold of $42.22 an ounce. Order 74–1–16, Dkt. 26274, adopted Jan. 3, 1974, 39 Fed.Reg. 1526 (1974). *See* 14 C.F.R. § 221.38(j) (1981) (requiring limitations to be set out in carrier tariffs). Liability was set to $20.00 per kilogram of damaged goods, or $9.07 per pound. However, after the United States abandoned its "official" price of gold in 1978, the CAB did not revise the limiting tariffs. Although the CAB expressed concern that there was no longer any legal basis for using the $9.07 limitation, *see* Bureau of Consumer Protection, Civil Aeronautics Board, Memorandum on Warsaw Convention Liability Limits, at 4, its Bureau of Compliance and Consumer Protection suggested that the CAB should continue to engage in the "legal fiction" that an official gold price exists in order to satisfy the liability limiting goals of the Warsaw Convention. *Id.* at 6. The result of the CAB's decision not to revamp its tariff of liability is that at a time when the free market price of gold has risen to more than $400.00 an ounce, airlines may calculate their liability limitation based on an artificial, non-existent gold price of $42.22 an ounce.

Against that background, this Court must decide whether Northwest's liability should be cut off at $9.07 per pound of damaged merchandise, the fictional standard; whether another limiting standard should be used, such as the current free market price of gold; or whether Northwest's liability to Kern should be unlimited. In *Franklin Mint Corp. v. Trans World Airlines,* 690 F.2d 303 (2d Cir.1982), the Second Circuit was faced with virtually the identical issues as are presented here. The Second Circuit first held that Article 22 is indeed unenforceable by courts of the United States. However, the *Franklin Mint* court also declined to adopt any of the proffered alternatives for determining liability, and has held that prospectively there will be no liability limit.

The parties had suggested four possible standards to be used to limit liability: (1) the last official price of gold in the U.S.; (2) the free market price of gold; (3) the Special Drawing Right ("SDR"), a unit of account established by the IMF;[6] or (4) the

---

6. *Franklin Mint, supra* at 310, provides a description of the SDR based, in part, on Ward, "SDR in Transport Liability Conventions: Some Clarifications," 13 *J.Mar.L.Com.* 1, 3 (1981): The SDR was created by the IMF in 1969 to replace gold and foreign currency in the international money reserve markets. IMF banks exchange SDRs for other convertible currencies as though they were lines of credit against which reserves are borrowed for use in central banks. Methods of calculating SDRs change over time, but currently are calculated in reference to the U.S. dollar, the Deutsche mark, the French franc, the Japanese yen, and the pound sterling. The amount of any of the five currencies in one SDR is a function of the

exchange value of the current French franc. Among the reasons given by the *Franklin Mint* court for rejecting the various alternatives were: a lack of international agreement on the proper unit of conversion; congressional repeal of the last official price of gold ($42.22); SDRs are created by the IMF without basis in the Warsaw Convention; the French franc is subject to unilateral change; and the highly volatile condition of the free market price of gold. *Id.* at 310–11. *Cf. Boehringer Mannheim Diagnostics, Inc. v. Pan American World Airways, Inc., supra,* (after 1978, the only proper basis for determining a carrier's liability limitation is with reference to the free market price of gold).

In declining to select any proposed alternative the Second Circuit concluded that it lacked the authority to set policy as to a new unit of conversion in an international matter:

> Treaty advice and consent and proposal is the province of the executive and ratification is the exclusive province of the United States Senate. While federal courts are necessarily called upon to interpret treaties, they must observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other .... However, selection of a unit of conversion and the level of value of a limitation on liability is plainly a matter to be negotiated by the parties, as the history of the Convention demonstrates.

690 F.2d at 311 (citations omitted).

Although the Second Circuit held that Article 22 is unenforceable, its ruling is prospective. This was because *Franklin Mint* overruled prevailing precedent in the United States, a decision not foreshadowed. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). As to cases arising before the issuance of the mandate in *Franklin Mint,* the last official

price of gold would be used to calculate damage liability. 690 F.2d at 312. Although the opinion does not expressly so state, its effect is that liability for damage to goods by air carriers on international flights will be unlimited.

■ This Court also has no authority to select an alternative basis for limiting liability, absent congressional direction. However, Northwest's liability should not be unlimited, since the clear intention of the Warsaw Convention in Article 22 was to limit the liability of air carriers on international runs. To conclude as the Second Circuit did in *Franklin Mint* that the action of Congress in eliminating an official price of gold should operate to eliminate all limitations of liability found in the Warsaw Convention reads too much into an unrelated act of Congress. That act was intended to deal with various monetary matters and only incidentally affected the provisions of the Warsaw treaty. There is no reason to believe that Congress intended to declare Article 22 obsolete.

■ Rather, this Court believes it should enforce the position taken by the CAB, the governmental agency most intimately concerned with the transactions at hand, and recognize the last official price of gold in the United States as the basis for conversion and liability limitation. That price, resulting in a liability limitation of $9.07 per pound of damaged goods, also was relied upon in *In re Air Crash Disaster at Warsaw Poland on March 14, 1980,* 535 F.Supp. 833 (E.D.N.Y.1982) and by the lower court in *Franklin Mint Corp. v. Trans World Airlines,* 525 F.Supp. 1288 (S.D.N.Y. 1981), *rev'd* 690 F.2d 303 (2d Cir.1982). Any change from this base should be determined by the executive and the legislature. Air carriers, at least in this country, have relied upon the last official price of gold and have filed tariffs based on that rate. Thus, the

percentage weights assigned to each currency. The dollar value of one SDR is calculated by adding the dollar value of each currency included based on the daily market exchange rate. SDRs tend to be less prone to fluctuation than the free market price of gold. This relative

stability led the Warsaw signatories to propose that the SDR be adopted as the official unit of conversion for the Warsaw Convention (Montreal Protocols). Congress was presented this proposal in 1977 but it has so far failed to ratify it.

public had notice of the liability limitations. Parties, such as the commercial entities in this case, may protect themselves through insurance. They are not made victims of hardships or injustice by the maintenance of the CAB rule.

Kern raises a second argument for unlimited liability premised on Article 25. Article 25 provides:

> (1) The carrier shall not be entitled to avail himself of the provisions of this convention which exclude or limit his liability, if the damage is caused by his wilful misconduct or by such default on his part as . . . is considered to be equivalent to wilful misconduct.

> (2) . . . or if the damage is caused by any agent of the carrier acting within the scope of his employment.

Kern asserts that Northwest's actions in accepting the duplicating machines with full knowledge of their inferior packaging constitutes wilful conduct sufficient to invoke Article 25. To the contrary, Northwest argues that its decision to ship the machines, arguably damaged and unquestionably poorly packaged, was not wilful misconduct. In its view, to accept Kern's argument would be to suspend liability limitation whenever a carrier made an exception on an airway bill and subsequent damage was claimed.

For purposes of Article 25 of the Warsaw Convention, wilful misconduct occurs where an act or omission is taken with knowledge that the act probably will result in injury or damage or with reckless disregard of the probable consequences. *See, e.g., Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 536–37 (2d Cir.1965); *Grey v. American Airlines, Inc.,* 227 F.2d 282, 285 (2d Cir.1955), *cert. denied,* 350 U.S. 989, 76 S.Ct. 476, 100 L.Ed. 855 (1956); *Excelled Sheepskin and Leather Coat Corp. v. ATC Services,* 16 Avi. 17, 609 (N.Y.S.Ct.1981). Wilfulness is largely a subjective matter. The questions of fact which must be resolved makes summary disposition inappropriate. *Id.* Thus, whether Northwest's liability to Kern is limited to $9.07 per pound (or $45,850.00) or whether Northwest is liable for $74,171.00 must be determined at trial.

Several other matters remain. First, the Court must determine whether and to what extent Bernard or Cheshire are liable for damage to Kern's duplicating machines. Bernard and Cheshire are land transporters not air carriers. They are not bound by the provisions of the Warsaw Convention. Second, Xerox Corporation, which was served with summons in place of its subsidiary Cheshire, has neither answered nor otherwise pled to Bernard's third party complaint. Accordingly, if service of process was valid, Bernard is given seven days in which to move for a default, or else the third party complaint will be dismissed for want of prosecution.

In accordance with this Opinion, IT IS HEREBY ORDERED that:

(1) Summary judgment is granted for Kern and against Northwest Airlines on the issue of whether Kern gave timely notice of damage to its goods pursuant to Article 26 of the Warsaw Convention.

(2) Pursuant to Article 22, Northwest's liability is limited to $9.07 per pound or $45,850.00. However, judgment will not be entered in that amount pending resolution of whether Northwest's decision to ship the duplicating machines as packaged constituted wilful misconduct sufficient to incur unlimited liability pursuant to Article 25.

(3) Bernard is given until April 12, 1983 to move for a default against Cheshire, and must support its motion with an affidavit showing service of process on Xerox to be good service, or the third party complaint brought by Bernard against Cheshire will be dismissed for want of prosecution.

A status hearing is set for April 25, 1983 at 9:45 a.m.